UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
TAIMA FLORES and S.L., as mother and natural guardian
on behalf of, K.L.,

                            Plaintiffs,

        - against-

CITY OF NEW YORK, KENNETH RAMBERT,
DAMANY FERRIL, ALI WILLACY, LELA BANKS,
KAMRON CHASE, ASHLEY PHILLIPS, MICAH
BRYANT, MARIE AIMER, JONATHAN CORONEL-
GUZMAN, CHRISTOPHER CILIENTO, and JOHN DOES
1-10,

                            Defendants.
-------------------------------------------------------------------- X

**AMEDNED COMPLAINT**

DOCKET NO.: 24 CV 7162

JURY TRIAL DEMANDED

Plaintiffs, TAIMA FLORES and S.L. on behalf of K.L., by their attorneys, LIAKAS LAW,

P.C., as and for their Complaint, allege as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      This is a civil rights action in which Plaintiff seek relief for violations of their rights,

privileges, and immunities guaranteed by the United States Constitution, including the Fourth and

Fourteenth Amendments, and federal law pursuant to 42 U.S.C. §1983, as well as New York State

law and the Laws of the City of New York, which permit redress for the acts herein described.

2.      Since 2021, the Administration of Eric Adams and the New York City Police

Department (hereinafter as "NYPD") have unleashed a campaign of violence under the guise of

reducing crime rates in the City of New York. Coupled with the NYPD's historic inability to

restrain and deter officers from committing acts of excessive force, the Adams Administration, the

NYPD Commissioner, and the NYPD's chiefs, have encouraged by their words and actions the

intentional, reckless, and indiscriminate use of excessive force throughout the NYPD.

1

3. On or about July 13, 2023, NYPD Police Officers Kenneth Rambert, Damany Ferril, Ali Willacy, Lela Banks, Kamron Chase, Ashley Phillips, Micah Bryant, Marie Aimer, Jonathan Coronel-Guzman, Christopher Ciliento, and John and Jane Does 1-10, acted both individually and in concert and/or otherwise jointly to unlawfully search and seize, assault, batter, and use excessive force against Plaintiffs.

4. Plaintiffs seek monetary damages (compensatory, and punitive) against Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

5. Within 90 days of the incidents alleged in this complaint, Plaintiffs served upon the City of New York a Notice of Claim setting forth the name and post office address of Plaintiff, the nature of the claim, the time when, the place where and the manner in which the claim arose, and the items of damages or injuries claimed.

6. More than 30 days have elapsed since Plaintiff's Notice of Claim was served on Defendant.

7. Hearings pursuant to §50(h) of the General Municipal Law was held of Ms. Flores on January 25, 2024, and of both K.L. and S.L. on April 11, 2024.

8. Defendant City has so far failed to resolve or adjust these claims.

9. Plaintiff have complied with all conditions precedent to the bringing of this action have been complied with.

10. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under laws of the United States.

11.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, because any claims brought under New York State or City of New York law are so related to the claims for which this Court has original jurisdiction that they form the same case or controversy.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) because at least one defendant resides, as defined by 28 U.S.C. § 1391(c)(2), in this judicial district and a substantial part of the events giving rise to this claim occurred in this judicial district.

13.     Pursuant to the New York City Human Rights Law (NYCHRL) § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, thereby satisfying the notice requirements of that section.


## PARTIES

14.     Plaintiff Taima Flores is a resident of the State of New York, County of Kings.

15.     Plaintiff S.L., on behalf of K.L., was a resident of the State of New York, County of Kings, at the time of the incident herein described, but now resides in the State of Arizona.

16.     Defendant City of New York (or "City") is a municipal corporation organized under the laws of the State of New York.  At all times relevant hereto, Defendant City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel.

17.     At all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

18.     Defendant Kenneth Rambert was at all relevant times, a duly sworn NYPD Detective employed by the City of New York.

19.     Defendant Damany Ferril was at all relevant times a duly sworn NYPD Sergeant employed by the City of New York.

20.     Defendant Ali Willacy was at all relevant times a duly sworn NYPD police officer employed by the City of New York.

21.     Defendant Lela Banks was at all relevant times a duly sworn NYPD police officer employed by the City of New York.

22.     Defendant Kamron Chase was at all relevant times a duly sworn NYPD police officer employed by the City of New York.

23.     Defendant Ashley Phillips was at all relevant times a duly sworn NYPD police officer employed by the City of New York.

24.     Defendant Micah Bryant was at all relevant times a duly sworn NYPD police officer employed by the City of New York

25.     Defendant Marie Aimer was at all relevant times a duly sworn NYPD police officer employed by the City of New York

26.     Defendant Jonathan Coronel-Guzman was at all relevant times a duly sworn NYPD police officer employed by the City of New York

27.     Defendant Christopher Ciliento was at all relevant times a duly sworn NYPD police officer employed by the City of New York

28.     At all times relevant, Rambert was assigned to the NYPD's 81st Precinct Detective Squad.

29.     At all times relevant, Defendants Ferril, Willacy, Banks, Chase, Phillips, Bryant, Aimer, Coronel-Guzman, and Ciliento were assigned to the NYPD 79th Precinct.

30.     Defendant John and Jane Does 1-10 were at all relevant times, duly sworn police officers and/or NYPD officials, employed by Defendant City through its NYPD, whose real names are not known.

31.     At all times mentioned herein, Defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York. Defendants are sued in their individual capacities.

32.     Defendant City is responsible for the tortious acts and omissions of its agents, servants, and employees, including, but not limited to the Individual Defendants, pursuant to the doctrine of *respondeat superior*.

## FACTS RELEVANT TO ALL DEFENDANTS

33.     On the afternoon of July 13, 2023, Ms. Flores and K.L. were riding bicycles near 82 Lexington Avenue, Brooklyn, New York.

34.     Ms. Flores was seventeen years old.

35.     K.L. was fifteen years old.

36.     Ms. Flores, K.L., and one of their friends were travelling together to meet up with two of their other friends.

37.     As they approached 82 Lexington Avenue, Ms. Flores and K.L. observed several police cars and police officers.

38.     The officers were standing on or around the steps leading up to a brownstone.

39.     Seated on the brownstone were three male youths.

40.     Two of these youths were the friends Ms. Flores and K.L. intended to meet.

41.    When she realized her friends were handcuffed and seated on the brownstone steps, Ms. Flores attempted to speak to her friends from the sidewalk to ask if they were okay.

42.    At the time, a metal fence and gate surrounded the front area of the brownstone, including the steps upon which the males were seated handcuffed.

43.    As a result, a metal barrier surrounded the three handcuffed males in addition to numerous police officers.

44.    When Ms. Flores approached the side of the fence, police officers, including Defendant Chase, told Ms. Flores to step back.

45.    For no reason at all, Defendant Bryant and other officers placed their hands on Ms. Flores.

46.    Although Defendants made Ms. Flores move, they permitted a white woman to remain on the steps unmonitored, with unobstructed access to the three handcuffed males.

47.    Ms. Flores and K.L. are black.

48.    The following screenshot from NYPD Body Camera footage shows this moment:



49.     When these officers touched her, Ms. Flores responded that the officers should not touch her and that she knew her rights.

50.     Ms. Flores next walked to the other side of the steps to speak to her friends.

51.     When Ms. Flores began walking to the other side of the steps, Defendants Ferril and Rambert were talking. They both looked at Ms. Flores.

52.     The following screenshot from NYPD Body Camera footage shows this moment:



53.     Ms. Flores is dressed in the cap, white shirt, and long red shorts.

54.     Defendant Rambert was wearing a purple plaid shirt, tie, and grey slacks.

55.     Defendant Ferril blue sergeant stripes on his left sleeve.

56.     This screenshot also depicts Defendants Bryant and Chase.

57.     K.L. also approached the side of the steps.

58.     At this time, Ms. Flores and K.L. were separated from the three handcuffed males by the fence, and Defendant Banks who stood between K.L., Ms. Flores, and the fence.

59.     In addition, the side of the steps is a solid brick or stucco wall.

60.     Defendant Banks stated to K.L. step back and made a motion with her hand directing K.L. to move farther along the solid wall of the steps towards the building.

61.     The following screenshot from NYPD Body Camera footage shows this moment:



62.     When Defendant Banks gave this instruction, Defendants Rambert, Ferril, Chase, Bryant, and Aimer were feet away from Defendant Banks, and could hear what she said and see the gestures she made.

63.     The following screenshot from NYPD Body Camera footage shows this moment:



64.     As this screenshot depicts, both K.L. and Ms. Flores followed Defendant Banks'
suggestion.

65.     Because they could see and hear Defendant Banks, these other Defendants knew
that Defendant Banks had directed Ms. Flores and K.L. towards the wall of the brownstone.

66.     Despite knowledge that Ms. Flores and K.L. were following the direction of
Defendant Banks, Defendant Rambert followed Ms. Flores.

67.     Defendant Rambert grabbed Ms. Flores from behind.

68.     Ms. Flores pulled her arms away and shouted, in substance, "don't touch me."

69.     Defendant Rambert grabbed Ms. Flores again.

70.     This time, however, Defendant Rambert grabbed Ms. Flores by the neck and began
choking her.

71.     While choking Ms. Flores, Defendant Rambert slammed Ms. Flores into the wall
of the brownstone's steps.

72.     Defendants lacked probable cause, reasonable suspicion, or any other justification

to make physical contact with, or use force on, Ms. Flores.

73.    Indeed, Defendant Rambert's attack on Ms. Flores served no tactical or strategic need, and under the circumstances, was a completely gratuitous use of force and an abuse of his power and authority.

74.    The following screenshots taken from NYPD Body Camera footage depict this moment:







75.     While choking Ms. Flores, Defendant Rambert told Ms. Flores, "So don't talk to me like that."

76.     While Defendant Rambert choked Ms. Flores, Defendants Ferri and Banks grabbed K.L., and Defendant Ferril threw K.L. across the pavement.

77.    K.L. weighed approximately eighty pounds on July 13, 2023.

78.    When Defendants Ferril and Banks first grabbed K.L., K.L. was standing against the wall of the brownstone's steps.

79.    Defendant Ferril took hold of K.L., pulled him from his position next to the wall, and moved K.L. across the length of Defendant Ferril's arm span.

80.    When Defendant Ferril let go, K.L. was thrown to the ground.

81.    Defendant Ferril caused K.L. to slam into the pavement causing K.L. injuries.

82.    K.L. sustained injuries to his arm and back which cause K.L. to bleed.

83.    K.L. also suffered pain, in addition to the terror of seeing Ms. Flores getting strangled by Defendant Rambert and the indifference of the rest of the police officers who were present.

84.    The following screenshots taken from NYPD Body Camera footage depict Defendant Ferril grabbing and throwing K.L.:











85.     Defendant Ferril had no tactical or legal justification for grabbing and throwing

K.L.

86.     Defendant Ferril's actions were meant to hurt, terrorize, and further intimidate a

fifteen-year old whose friend was being strangled for no reason.

87. When K.L. hit the ground, Defendant Bryant stood over K.L. and said "Oh my G-d."

88. After throwing K.L., Defendant Ferril repeated "collar him."

89. When Defendant Ferril repeated "collar him," Defendant Ferril referred to Ms. Flores.

90. In other words, Defendant Ferril misgendered Ms. Flores.

91. After standing up, K.L. was upset that Defendant Rambert had choked Ms. Flores.

92. K.L. kept repeating to the other officers that Defendant Rambert had choked Ms. Flores but none of the other officers were willing to do anything about it.

93. Indeed, no Defendant or other police officer intervened to stop Defendant Rambert choking Ms. Flores.

94. Moreover, no Defendant or other police officer intervened prevent any other use of force or the subsequent false arrest of Ms. Flores.

95. While K.L. protested Defendants' actions, Defendant Aimer stood in front of K.L. and tried to block him from seeing what was happening.

96. When K.L. repeated that Defendant Rambert choked Ms. Flores and that Ms. Flores did nothing, Defendant Aimer stated, "I know."

97. Defendant Rambert, Chase, and Banks threw Ms. Flores to the ground where they handcuffed Ms. Flores behind her back.

98. Defendants Willacy and Coronel-Guzman took Ms. Flores to a patrol car and drove her to the 79 Precinct.

99. At the 79 Precinct, Ms. Flores was searched by Defendant Phillips while Defendants Coronel-Guzman and Ciliento stood watch.

100. Defendants Willacy, Phillips, Coronel-Guzman, and Ciliento were aware Ms. Flores had committed no crime or offense, were aware there was no basis to arrest her, and that the search and seizure of Ms. Flores violated federal, state and local law.

101. Defendants Willacy, Phillips, Coronel-Guzman, and Ciliento were further aware of Defendant Rambert and Defendant Ferril's actions, and that their arrest, search, and detention of Ms. Flores was retaliatory.

102. Defendants committed an unwanted touching of Ms. Florez, which under the circumstances constitutes a battery under New York State law.

103. Ms. Flores was taken to Woodhull Hospital for evaluation from the precinct.

104. During the trip to the hospital, Defendant Willacy admitted that Defendant Rambert did too much.

105. Ms. Flores was returned to the precinct where she remained handcuffed to a bench for a number of hours.

106. At some point after midnight, Ms. Flores was released from custody at the 79 Precinct.

107. Ms. Flores was never charged with any offense.

108. In the 79 Precinct Command Log, Ms. Flores is listed as having been arrested for assault.

109. In New York, Assault requires proof that person caused physical injury to another. *See e.g.* N.Y. Penal Law § 120.00.

110. Ms. Flores caused no one physical injury.

111. Moreover, there was no basis whatsoever for any officer to believe that Ms. Flores caused physical injury anyone on July 13, 2023.

112. On July 13, 2023, Defendants had no basis to arrest Ms. Flores.

113. Defendants had no basis to use force, nor allow the use of force, in their presence.

114. There was no tactical or legal justification for Defendant Rambert to choke Ms. Flores.

115. Ms. Flores complied with every directive by police officers of where to move when she tried to communicate with her friends.

116. Ms. Flores and K.L. were complying with Defendant Banks to move further along the base of the brownstone's steps.

117. Indeed, at the time Defendants grabbed and brutalized Ms. Flores and K.L., they had no access to the three handcuffed young males. A brick or stucco wall, a fence, and numerous police officers we between the three handcuffed males and Ms. Flores and K.L.

118. Ms. Flores and K.L. committed no crime or other offense on July 13, 2023.

119. Ms. Flores and K.L. posed no threat to any officer or civilian present.

120. Ms. Flores and K.L. did not strike nor attempt to strike any officer.

121. Ms. Flores and K.L. were not attempting to flee the officers when they began assaulting, battering, and using excessive force against him.

122. At all times hereinafter mentioned, Defendants had a duty to intervene in the unlawful acts and misconduct committed by their co-Defendants but failed to do so.

123. Upon information and belief, Defendants processed Ms. Flores' arrest, prepared paperwork related to her arrest and conferred with the District Attorney's office and/or the New York City Law Department to bring criminal charges against Ms. Flores.

124. On or about August 1, 2023, a Freedom of Information Law Request was submitted to the New York City Law Department for records related to Ms. Flores. On August 15, 2023, the

Law Department responded that no records could be located following a diligent search.

125. On or about June 28, 2024, a Freedom of Information Law Request was submitted to the Kings County District Attorney ("KCDA") for any records related to Ms. Flores. KCDA responded the same day that its database contained no record of arrest for Ms. Flores.

126. Upon information and belief, Defendants communicated with a representative of the District Attorney's office and/or the New York City Law Department and presented false information and/or evidence to the prosecutor despite knowledge that this false information would be used to prosecute Plaintiff.

127. Upon information and belief, Defendants communicated with a representative of the District Attorney's Office and failed to provide the District Attorney with relevant information, including exculpatory information.

128. Upon information and belief, Defendants failed to report the incident, including the actions of Defendants Rambert and Ferril to the Internal Affairs Bureau or any internal unit or agency responsible for investigating officer misconduct.

129. Upon information and belief, Defendants failed to arrest Defendants Rambert and Ferril for offenses such as assault in the third degree or criminal obstruction of breathing or blood circulation.

130. Upon information and belief, Defendants failed to arrest Defendant Rambert for violating N.Y.C. Admin. Code. § 10-181, which prohibits unlawful methods of restraint. This section makes it a misdemeanor for a person to "restrain an individual in a manner that restricts the flow of air or blood by compressing the windpipe or the carotid arteries on each side of the neck . . . in the course of effecting or attempting to effect an arrest."

131. Indeed, upon information and belief, Defendant Rambert and the other Defendants

knew his conduct was constituted a criminal offense, and sought to help conceal Defendant Rambert's actions.

## FACTS RELEVANT TO PLAINTIFF'S *MONELL* CLAIM AND RELATED STATE LAW CLAIMS AGAINST THE CITY OF NEW YORK

### I.   EXCESSIVE FORCE IN THE ADAMS ADMINISTRATION

132.   When Mayor Eric Adams took office in January 2022, NYPD morale was low.

133.   For example, an internal NYPD survey indicated that more than half those surveyed wished they never became police officers.[1]

134.   Eighty percent of those surveyed "fear aggressively fighting crime because of the threat of criminal liability, being sued, or being unfairly disciplined."[2]

135.   Further, 73% believed outstanding police officers do not receive appropriate recognition, and 78% believed that the NYPD did not actually support them.

136.   At the same time, however, Mayor Adams campaigned on fighting crime.

137.   When he took office, Mayor Adams confronted a rising crime rate.

138.   For example, New York City shootings in 2021 were at a 15-year high.[3]

139.   In early 2022, the year over year crime spike was between 45% and 48% during 2022.[4]

140.   In fact, Mayor Adams reported called 911 to report a street fight during his

---

[1] Balsimini, D., N.Y. POST (Nov. 20, 2021), "Survey Says More Than Half NYPD Wishes They Never Joined the Force," available at: https://nypost.com/2021/11/20/survey-says-more-than-half-nypd-wishes-they-werent-blue/.
[2] *Ibid.*
[3] *See* https://www.nyc.gov/office-of-the-mayor/news/008-23/transcript-mayor-eric-adams-citywide-crime-statistics-2022
[4] *Ibid.*

commute to work on his first day as mayor.[5]

141.    In January 2022, Mayor Adams began restricting, rolling back, and undoing a number of criminal justice and policing reforms that had been implemented in the preceding decade.[6]

142.    Moreover, despite claims that Mayor Adam's strategies tactics have reduced crime, media reports indicate that crime numbers continue to rise.[7]

143.    Facing declining morale in the NYPD and increased instances of criminal activity in the City, Mayor Adams and his administration began an effort to combat crime by encouraging more aggressive police conduct and diminishing the threat of discipline against NYPD officers.

144.    In December 2022, John Chell was promoted to NYPD Chief of Patrol.

145.    Chell has the rare distinction of having been found liable in a civil trial for intentionally shooting an unarmed suspect.

146.    Not only was Chell found to have used excessive deadly force, but the jury also found his testimony that he fired accidentally incredible and contradicted by both testimonial and documentary evidence.[8]

147.    As a result, the family of the man killed by Chell was awarded $2.5 Million by a jury.

---

[5] Durkin, E., POLITICO (Jan. 28, 2022), "Eric Adams' War Against Crime Sparks Democratic Unrest," available at: https://www.politico.com/news/2022/01/28/adams-nypd-crime-00002011.
[6] *Ibid*; *see also* https://www.nyc.gov/office-of-the-mayor/news/045-22/mayor-adams-releases-blueprint-end-gun-violence-new-york-city#/0.
[7] McCarthy, C., N.Y. POST (Apr. 3, 2024), "NYC Serious Crimes Hit Levels Unseen in Two Decades Last Year Even as Mayor Adams Claims 'Crime is Down'," available at: https://nypost.com/2024/04/03/us-news/crime-was-in-fact-up-year-as-mayor-adams-tries-to-downplay-disorder/.
[8] McCarthy, C., N.Y. POST (Dec. 3, 2022), "CITY IN CRISIS Meet the new brass at NYPD Leadership reshuffle," available at: https://nypost.com/2024/04/03/us-news/crime-was-in-fact-up-year-as-mayor-adams-tries-to-downplay-disorder/

148.    Despite wrongfully killing another human being as a police officer, the NYPD promoted Chell to be Chief of Patrol at a time when it was facing a morale crisis.

149.    Almost immediately, Chell oversaw an aggressive enforcement push.

150.    In particular, Chell began encouraging NYPD officers to engage in high risk and dangerous vehicle pursuits of suspects.[9]

151.    In the first three months of 2023, vehicle pursuits increased 600%.[10]

152.    Implementation of this tactic, which involved the use of vehicle pursuits the NYPD had not utilized for thirty years, contradicts the NYPD Patrol Guide's directive that "must be terminated when the danger to the public outweighs the benefits of apprehending the perpetrator."[11]

153.    The vehicle pursuits, however, have resulted in death and serious physical injury to the public.[12]

154.    In other words, under Chell, police officers are encouraged to engage in force tactics that violate the patrol guide.

155.    Moreover, Chell is unapologetic about using aggressive, violent, and dangerous tactics. In July 2023, he stated, "People thinking they can take off on us — those days are over. The days of driving around this city, lawless, doing what you think you're going to do — those days are over."[13]

---

[9] Gonen, Y., Bhat, S., & Siegel, H., THE CITY (July 5, 2023), "NYPD Car Chases Up Massively Under Mayor Adams — With Sometimes Fatal Results," available at:
https://www.thecity.nyc/2023/07/05/nypd-car-chases-eric-adams-quality-life-community/
[10] *Ibid*.
[11] *Ibid*.
[12] *Ibid*.
[13] Woods, A., N.Y. POST (July 10, 2024), "Rampant 'ghost cars' with fake plates to blame for uptick in dangerous police pursuits: NYPD official" available at:

156.    NYPD officials critical of Chell and his tactics have been silenced.

157.    NYPD Chief of Risk Management Matthew V. Pontillo was fired by former NYPD Commissioner Edward Caban in August 2023 when Pontillo raised concerns about the use of vehicle pursuits and a unit that serves under Chell known as the Community Response Team.[14]

158.    Specifically, Pontillo flagged twenty officers who he believed should receive additional supervision and training as a result of the vehicle pursuits.[15]

159.    Pontillo also criticized the lack of transparency in the Community Response Team.[16]

160.    As a result, Pontillo was forced to resign by Commissioner Caban.[17]

161.    In addition to Pontillo, Commissioner Caban targeted other NYPD officials whose purpose was to keep the NYPD in check.[18]

162.    Commissioner Caban forced the resignation of NYPD Department Advocate Amy Litwin, a former assistant district attorney, over her views regarding discipline for Chief of Department Jeffrey Maddrey.[19]

163.    The circumstances surrounding Maddrey further highlight the lawless culture pervading the NYPD encouraged by Mayor Adams, former Commissioner Caban, and others.

164.    In November 2021, a retired NYPD officer who had served under Maddrey was

https://nypost.com/2023/07/10/nypds-john-chell-blames-ghost-cars-for-uptick-in-police-pursuits-in-nyc/.

[14] Gonen, Y., Honan, K., & Siegel, H., THE CITY (Aug. 22, 2023), "NYPD Chief Who Criticized Surge In Vehicle Pursuits Ousted," available at: https://www.thecity.nyc/2023/07/05/nypd-car-chases-eric-adams-quality-life-community/

[15] Ibid.

[16] Ibid.

[17] Ibid.

[18] Ibid.

[19] Ibid.

arrested for chasing three teenage boys while wielding a firearm.

165.  Maddrey went to the 73 Precinct where the man was held and had the arrest voided and his former colleague released without charges.

166.  The Civilian Complaint Review Board found that Maddrey abused his authority in interfering with the arrest.

167.  As noted, Litwin was in favor of disciplining Maddrey.

168.  More importantly, the NYPD Commissioner at the time, Kechant Sewell, wanted to discipline Maddrey by docking him up to ten vacation days.

169.  Although, this was the sole decision of Commissioner Sewell, Mayor Adams and other officials from his administration attempted to pressure Commission Sewell to reject discipline for Maddrey.

170.  After imposing discipline on Maddrey against the wishes of Mayor Adams and other high ranking NYPD officials, Commissioner Sewell resigned.

171.  Commissioner Sewell was replaced by Commissioner Caban, who as noted, has sought to remove personnel that challenge the aggressive and lawless attitude espoused by NYPD leadership.

172.  Commissioner Sewell resigned on June 12, 2023.

173.  Caban was appointed Commissioner on July 17, 2023.

174.  Prior to his appointment, Caban was the first deputy commissioner.

175.  Caban was acting commissioner after Sewell resigned.

176.  Caban, therefore, was NYPD Commissioner on July 13, 2023.

177.  As Commissioner, Caban has sought to diminish NYPD's disciplinary process, and in particular, the NYPD's capacity to discipline officers who use excessive force.

178.    Caban has rejected disciplining officers in at least 54 cases where the Civilian Complaint Review Board ("CCRB") recommended officers be disciplined for unjustified uses of force including chokeholds, deploying tasers, and striking protesters with batons.[20]

179.    In one instance, Caban denied CCRB's recommendation to discipline two officers involved in the 2019 shooting death of Kawaski Trawick. CCRB recommended they be disciplined for escalating the situation and failing to render sufficient aid after they shot Trawick.

180.    The decision in the Trawick shooting is all the more egregious because NYPD delayed in giving CCRB the relevant body camera footage and other evidence. As a consequence, Caban was able to justify withholding discipline based on CCRB's delay in bringing administrative charges, a delay NYPD itself caused.

181.    Caban resigned as commissioner on September 12, 2024, due to revelations that he is the subject of a federal corruption investigation.

182.    Three days before resigning, on September 9, 2024, Caban issued changes to the NYPD Disciplinary Matrix, which are the guidelines NYPD officers are supposed to receive for misconduct and other violations. These changes reduced the punishments for a number of categories of misbehavior, including violations of department rules and regulations; abuse of authority; discourtesy and offensive language; firearm-related incidents; off-duty misconduct; and prohibited conduct.[21]

183.    In addition, the Adams administration cut funding to the CCRB which has caused

---

[20] Umansky, U. PROPUBLICA (June 27, 2024), "New Yorkers Were Choked, Beaten and Tased by NYPD Officers. The Commissioner Buried Their Cases." available at: https://www.propublica.org/article/nypd-commissioner-edward-caban-police-discipline-retention-eric-adams.
[21] Blau, R., THE CITY (Sept. 13, 2024), "Caban Watered Down NYPD Misconduct Rules as Final Act," available at: https://www.thecity.nyc/2024/09/13/caban-watered-down-nypd-punishments-as-final-act/.

the CCRB to limit its investigations into officer misconduct.

184.    The polices, practices, customs, and attitudes developed, promulgated, and manifested in the behavior of the Adams administration and the NYPD leadership heretofore described, has led to the unrestrained use of force by NYPD officers, and in turn, the intentional and reckless use of excessive force.

185.    Moreover, due to the lack of supervision, training, and discipline, and the mandate to "fight crime" and intimidate private citizens into compliance, NYPD officers use force divorced from the tactical consideration and self-control required of them under the law.

186.    Indeed, NYPD's own statistics demonstrate the explosion in the use of force in the last several years.

187.    From 2021 to 2022, officer use of force incidents increased overall by over thirty percent (30%).

188.    From 2022 to 2023, the number of NYPD use of force incidents increased sixteen percent (16%).

189.    From 2021 to 2023, however, the total number of use of force incidents by NYPD officers has increased more than fifty-one percent (51%).

190.    So far, in 2024, the NYPD reported 211 incidents where officers used firearms. The NYPD reported only forty-one officer firearms discharges in 2023, and sixty-two in 2022.

191.    As these numbers demonstrate, since 2021, the use of force by the NYPD has increased by more than half.

192.    This is not surprising, given public statements by Mayor Adams and high-ranking NYPD officials.

193.    Of course, human experience shows that the statements made within the NYPD

outside of public view are even more extreme.

194.    With the expanded use of excessive force, the number of complaints of officer misconduct has increased in kind.

195.    CCRB received approximately 50% more complaints within CCRB's jurisdiction in 2023 than it received in 2022.[22]

196.    Moreover, in terms of all complaints received by CCRB, which include both complaints CCRB may investigate and those it has to refer to other agencies, CCRB received 27% more complaints in 2023 than in 2022, or 12,086 in 2023 up from 8,805.[23]

197.    NYPD and City officials claim that such increases are the natural consequence of officers being more engaged in enforcement, but this is a false narrative.

198.    The NYPD commissioner only concurred in 56% of the disciplinary recommendations from the CCRB in 2023, down from 71% in 2021.[24]

199.    NYPD's delays in providing materials and evidence to CCRB cause delays in CCRB's ability to bring disciplinary charges, which in turn allows the Commissioner to forego disciplining officers.[25]

200.    NYPD also maintains an Internal Affairs Bureau, a Force Investigation Division, as well as a system of investigations at lower levels, sometimes called command level investigations.

---

[22] Civilian Complaint Review Board Annual Report 2023, p. 4, available at: https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_biannual/2023_CCRB_Annu al_Report.pdf.
[23] *Id*. at p. 4.
[24] *Id*. at p. 4.
[25] Umansky, E., PROPUBLICA (Sept. 12, 2024), "The NYPD Is Tossing Out Hundreds of Misconduct Cases — Including Stop-and-Frisks — Without Even Looking at Them," available at: https://www.propublica.org/article/nypd-tossed-out-police-misconduct-discipline-cases-edward-caban.

201. NYPD does not make statistics regarding these investigations and their resulting discipline, if any publicly available. As a result, Plaintiffs are limited in their ability to investigate these practices.

202. The practices and behavior of senior NYPD officials, however, as well as the actions of individual officers clear that any internal investigation and discipline system has been stripped of any capacity to limit officer conduct.

203. In sum, whether for political expediency or a genuine belief in unrestrained police conduct, Mayor Adams and the NYPD leadership his administration put in place sought to deal with the dual problems of rising crime and low officer morale by removing or limiting what checks and controls exist to deter and prevent misconduct and police brutality.

204. Moreover, the conduct of the NYPD Commissioner their chiefs signal to officers of every rank that they have free reign to act as they will throughout the City.

205. Thus, when Defendant Rambert strangled and brutalized Ms. Florez, Defendant Ferril threw K.L., and the other Defendants did nothing to prevent, stop, or remedy this behavior, they did so for several reasons.

206. First, Defendants knew that officials like Chell encouraged officers to demonstrate control by using aggressive, and in some ways terrifying, tactics to intimidate and exert control.

207. Second, Defendants understood that NYPD and City leadership approved of tactics and behavior that contradicted the Patrol Guide, including limitations on the use of force.

208. Third, Defendants knew that they would face little chance of being disciplined or prosecuted for their actions.

## II.   THE FAILURE TO STAMP OUT POLICE MISCONDUCT

### a.   For Nearly 30 Years, the City has Prevented Significant Independent Inquiry into the NYPD

209.    Developments under the Adams Administration are only one part of a larger constellation of policies, practices, and customs causing the violations of Plaintiffs' constitutional, common law, and statutory rights.

210.    On July 7, 1994, chaired by the Hon. Milton Mollen, the eponymous Mollen Commission, released its public final report titled "The City of New York Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department" [hereinafter "Mollen Comm'n Final Report" or "Final Report"].

211.    The Mollen Commission's findings, as discussed more thoroughly below, were explosive, and evidenced a systematic, and sometimes intentional failure, at every level of the NYPD to investigate corruption, abuse, and misconduct by its officers including sometimes high-ranking members of the NYPD.

212.    The corruption, abuse, and misconduct exposed by the Mollen Commission included, but was not limited to: police officers robbing drug dealers, selling drugs and guns that they had stolen, randomly assaulting and battering citizens for fun, raping sex workers, running protection for gang members and drug dealers, engaging in bribery scams including with tow truck operators and those they issued summonses to, drinking and doing drugs while on and off duty, burglarizing/robbing/stealing guns, drugs, money, and valuables from citizens, tampering with evidence including carrying "drop guns" and other evidence to plant on arrestees and/or those they may shoot, frequently committing perjury and/or submitting false information to prosecutors to secure convictions and/or cover up their misdeeds, as well as a general wide-spread refusal to

report collogues who commit misconduct and crimes.[26]

213.    Prior to the Mollen Commission, the Knapp Commission (1970-1973), the Helfand Investigation (1949-1950), the Seabury Investigation (1932), the Curran Committee (1912), and the Lexow Commission (1895) each exposed patterns of corruption and abuse at the NYPD.

214.    Nearly every twenty years, the then existing patterns and practices of widespread corruption and abuse at the NYPD were exposed by these independent commissions.

215.    It has been almost 30 years since the Mollen Commission issued its final report.

216.    Following the Mollen Commission's bombshell hearings and reports, the City formed the Commission to Combat Police Corruption (CCPC) which is allegedly an independent panel formed to monitor and evaluate the anti-corruption efforts of the NYPD which were found to be largely ineffective, at times intentionally so, by the Mollen Commission.

217.    The CCPC has no authority to investigate instances of police corruption or misconduct, it merely issues annual reports on whether, in its determination, the NYPD is effectively monitoring investigating and corruption, based on the information that NYPD deigns to offer it.

218.    All members of the CCPC are appointed by the Mayor of the CITY and serve at his pleasure.

219.    The CCPC cannot even issue a subpoena unless the Department of Investigation (DOI), a mayoral agency of the City, and thus, part of the City itself, allows it to.

220.    Upon information and belief, the CCPC was not created for its stated reasons alone, but also and/or solely to offer the appearance of sufficient independent oversight in order to avoid

---

[26]    Mollen Comm'n Final Report, (July 7, 1994) available online at: www.nyc.gov/assets/doi/images/content/timeline/MollenCommissionNYPD.pdf (last accessed Nov. 26, 2023).

the appointment of another commission like the Mollen Commission which would have the power to issue subpoenas, conduct independent investigations, and to make findings supported by evidence.

221.    As discussed by the Mollen Commission at length, the NYPD has a pattern and practice of endangering the safety of the public by allowing officers who commit misconduct and/or are otherwise abusive and/or corrupt, to avoid detection, prosecution, discipline, and termination, to spare the department potential embarrassment and/or to prevent civil and/or criminal consequences for those who commit, support, and/or turn a blind eye to rampant misconduct, corruption, and abuse at NYPD.

222.    An independent commission, with at least the powers and independence granted to the Mollen Commission is both long overdue and desperately needed.

223.    The Mollen Commission's Final Report is incorporated hereto by reference.[27]

224.    The CITY received the findings, testimony, evidence, and facts relied upon and reported by the Mollen Commission and has had the findings in its possession for nearly thirty years.

### i.  Of "Rats" and Policemen:

225.    As succinctly stated by the Mollen Commission, "the problem of police corruption extends far beyond the corrupt cop. It is a multi-faceted problem that has flourished in parts of our City not only because of opportunity and greed, but because of **a police culture that exalts loyalty over integrity; because of the silence of honest officers who fear the consequences of "ratting"**

---

[27] Plaintiffs are limited by the facts presently known and available to Plaintiffs and will seek discovery of the full Mollen Commission files as in the CITY's possession during discovery.

**on another cop no matter how grave the crime**…"[28]

226.     Consistent with the issues reported by the Mollen Commission thirty years ago, officers today do not report misconduct, abuse, and criminal acts of their fellow officers for fear of being "labeled a "rat" [and because they] lack[] confidence in the Department's commitment to uncover corruption and maintain confidentiality."

227.     The Mollen Commission also noted that officers had told them "that their careers would be ruined" if they reported a fellow officer's misconduct and that "[t]he evidence shows that this belief was not unfounded."

228.     As in the days of the Mollen Commission, the NYPD continues to ensure it is difficult and dangerous for officers to report misconduct.

229.     Despite the NYPD's actual knowledge for more than thirty years that members of its force were in large numbers failing, to report corruption, fraud, abuse, misconduct and criminal acts by their fellow officers, and thus, themselves committing unlawful acts, civil rights violations, and misconduct, the CITY has done little, if anything, to make officers more likely to intervene in the unlawful acts of their colleagues or even to report same.

230.     Here, the individual Defendants as well as the numerous other NYPD officers witnessed the force used against Plaintiffs, Ms. Flores' false arrest, and either witnessed and/or knew about the false statements made against her, but did nothing, and said nothing, thereby ensuring that the blatant constitutional violations committed in their presence continued, including further physical assault and an unlawful detention.

231.     Patrol Guide 221-10 contains the following three sentences which have remained virtually unchanged for decades: "Failure to intervene in the use of excessive force or report excessive

---

[28] Mollen Comm'n Final Report, *supra*, at p. 4 (emphasis added).

force or failure to request or ensure timely medical treatment for an individual is serious misconduct that may result in criminal and civil liability and will result in department discipline up to and including dismissal. If a member of service becomes aware of the use of excessive force or failure to request or ensure timely medical treatment for an individual, the member must report such misconduct to the Internal Affairs Bureau Command Center. This report can be made anonymously."[29]

232. The policy does not provide any information on how to contact IAB or what protections will be given to officers who cooperate with "the rat squad" as IAB is commonly referred to by officers.

233. The policy does not discuss the protections for whistleblowers or provide any information that would allow an officer to feel comfortable reporting a use of force that was unconstitutional given that they too will be deemed a "rat" for doing so.

234. The policy does not even include the number that officers can call to make such a report.

235. The NYPD does not even provide any elaboration on this three-sentence policy, buried among thousands of pages of other policies.

236. Despite the three-sentence policy promulgated by the CITY, the actual custom and practice of the NYPD is that when an NYPD officer reports on another officer, they are a "rat" forever and face perpetual ostracization.

237. The NYPD even has a custom and practice of identifying and thereby deriding an officer who seeks to follow the rules, including the Patrol Guide, and the laws of the State of New York, as a "shakebox" or "shakey" indicating they are not "good cops" or "on the level" cops who and cannot be trusted with preferential assignments or even invited to after work events.

---

[29] NYPD Patrol Guide 221-10.

238.    Being labeled "a rat" is worse still and is often the death knell of any NYPD career.

239.    Reporting fellow officers in an organization as insular as the NYPD, is regarded as an act of social deviance, that feels like a criminal act and is often treated like one.

240.    As former Detective Jeffrey McAvoy recalled to the New York Times, when he called IAB in 2008 to report a lieutenant of stealing thousands of dollars from a drug dealer, he was physically ill at the idea of following this policy: "I went to the bathroom about a dozen times and threw up, actually physically threw up, before I made the call."[30]

241.    Other officers labeled "rats" have been bullied, harassed, and ostracized by those they once considered not just coworkers, but family.

242.    Some officers labeled "rats" or who have testified about the crimes of other officers have been pushed out of the department, and some have attempted suicide.

243.    In 2011, a NYPD officer and union delegate allegedly touched the third rail of the one train in a suicide attempt after being subpoenaed to testify in the Bronx ticket fixing inquiry.

244.    Being labeled a "rat" can also get an officer killed.

245.    As former NYPD police officer Bernard Cawley put it when he testified before the Mollen Commission: "…it was the Blue Wall of Silence. Cops don't tell on cops. And if they did tell on them, **just say if a cop decided to tell on me, his career's ruined**. **He's going to be labeled as a rat**….And chances are **if it comes down to it, they're going to let him get hurt**."[31]

246.    Moreover, despite providing training and instruction for literally every possible piece of paperwork that may be filled out and endless videos and tactical training scenarios for situations

---

[30] Goldstein, J. N.Y. Times, (Jun. 24, 2012), "Officers, Exhorted to Report Corruption, Still Fear Retaliation" available at: https://www.nytimes.com/2012/06/25/nyregion/new-york-police-officers-face-retaliation-for-reporting-corruption.html (last accessed Feb. 26, 2024).
[31] Testimony of Bernard Cawley before the Mollen Commission available at: https://youtu.be/L_1hxKgFsWw?si=JGtFz8lw2wmESKK1 (last accessed Nov. 26, 2023).

that most officers will never encounter, the NYPD appears to provide zero training or instruction on how to effectively intervene in excessive force, false arrest, and/or other misconduct and civil rights violations, or how to safely report their fellow officers.

247.     The NYPD has failed to develop specific and realistic instruction or regular training on how to navigate detecting, intervening in, and reporting misconduct, including the use of excessive force.

248.     The NYPD has also failed to investigate and discipline instances where officers are present for or know about misconduct, including excessive force, but fail to intervene and/or report it.

249.     This sends a clear message that if an officer witnesses their fellow officer commit acts of corruption, misconduct, or even crimes – they should keep their mouth shut.

250.     In fact, the Mollen Commission heard testimony that officers had been explicitly told at roll call "if you get caught, keep your mouth shut."[32]

251.     The City knows to a moral certainty that failing to provide training and policies on how to intervene in and report misconduct makes it unlikely that anyone will report misconduct or intervene to stop it from occurring.

252.     The City knows to a moral certainty that allowing these customs and practices to continue allows serious misconduct to go unreported and encourages officers, including those who witness misconduct, to present false evidence and/or false information in official reports and/or to the prosecution in order to assist in covering up misconduct.

253.     The City knows to a moral certainty that its acts and omissions will allow officers who commit significant misconduct, including civil rights violations, to remain on the job where they can

---

[32] Mollen Comm'n Final Report at *3.

harm people – including people like Plaintiffs.

254.    The City knows to a moral certainty that failing to enact policies to make it easier and safer for officers to report misconduct will mean that most constitutional violations, including egregious violations involving deaths and horrific acts, will go unreported or will be actively covered up.

255.    The City has done nothing to revise its policies or training to prevent these inevitable consequences of its failures from harming citizens like Plaintiffs.

### ii. 'TRI' Not to Call IAB

256.    Following the July 17, 2014, homicide of Eric Garner, and the November 20, 2014, homicide of Akai Gurley, both at the hands of NYPD officers, the NYPD made significant changes to its investigations of excessive force.

257.    Those changes have, upon information and belief, prevented the independent and uncorrupted investigation into acts of excessive force and assisted officers in covering up incidents of excessive force, including by preventing IAB from investigating serious incidents like the one at issue here.

258.    Prior to 2015, when a NYPD officer used excessive force that caused death or significant injury, the incident resulted in a "callout" to IAB who would dispatch officers to interview injured arrestees or investigate deaths independent of the rest of the NYPD.

259.    In 2015, the NYPD developed the Force Investigations Division (FID) which was allegedly created to investigate uses of force.

260.    The policy changes mandated that where NYPD officers discharged their firearms, and/or where an arrestee died, or was likely to die following an interaction with NYPD, the FID would have sole jurisdiction to investigate whether the force used was justified.

261.    The policy change essentially divested the authority of IAB to investigate any deaths at the hands of NYPD.

262.    FID is not independent in the manner that IAB was intended to be.

263.    Upon information and belief, the true purpose of FID was to usurp the jurisdiction of IAB in serious force cases, including all death cases so that the investigation can be guided to find that the officers were justified in using force, including deadly force.

264.    IAB investigations of custodial deaths had led to multiple prosecutions of NYPD officers prior to the development of FID.

265.    Upon information and belief, to date, FID's investigations have not led to any prosecutions of NYPD officers.

266.    Upon information and belief, FID spends most of its extensive resources gathering evidence to justify uses of excessive force, discredit witnesses who do not support the NYPD's narrative, delaying questioning of the subject officers, and controlling evidence (including in allowing significant evidence to be ignored) collection from crime scenes of serious including fatal, uses of police force.

267.    Upon information and belief, to date, FID has consistently found that every NYPD officer who used fatal force was justified in doing so.

268.    Upon information and belief, to date, FID has consistently found that every NYPD officer who used fatal force was justified in doing so.

269.    Upon information and belief, FID is consistently staffed with investigators who lack the knowledge, skills, abilities, and work-ethic to conduct a complex investigation, and/or those who have significant force histories, corruption histories, and/or credibility issues – thus leaving investigations vulnerable to both substandard police work and corruption.

270.    On May 27, 2016, the NYPD revised its Force Policy reporting guide and implemented the TRI report.

271.    Below is a true and accurate copy of the first page of the May 27, 2016, Force Policy Revision:




### PATROL GUIDE 221
### TACTICAL OPERATIONS

**USE OF FORCE – INVESTIGATIVE RESPONSIBILITY AND REPORTING GUIDE**

| LEVEL OF FORCE | EXAMPLES OF FORCE | OR | TYPE OF INJURY | SUPERVISOR | METHOD OF REPORTING |
|---|---|---|---|---|---|
| LEVEL 1 | • Hand or foot strike<br>• Forcible take-down<br>• Wrestling a subject to ground<br>• OC spray<br>• CEW/Taser in cartridge mode<br>• Mesh restraining blanket | | • Physical injury<br>• Alleged[1] excessive Level 1 force with no injury | Immediate Supervisor<br>(Must be one rank above the subject officer)<br><br>*CEW/Taser = Lieutenant or Above[2]* | Threat, Resistance, or Injury Incident Worksheet |
| LEVEL 2 | • Intentional striking of a subject with an object (e.g. impact weapon)<br>• Police canine bite<br>• CEW/Taser in drive stun mode | | • Substantial physical injury<br>• Alleged or suspected[1] excessive force with physical or substantial physical injury<br>• Attempted suicide by prisoner | C.O./X.O./Duty Captain<br>(Must respond to scene)<br><br>*Borough Investigations Unit May Assist* | Threat, Resistance, or Injury Incident Worksheet & Investigating Supervisor Assessment Report |
| LEVEL 3 | • Deadly physical force<br>  ○ Physical force that is readily capable of causing death or serious physical injury | | • Serious physical injury<br>• Alleged or suspected excessive force with serious physical injury<br>• Attempted suicide by prisoner with serious physical injury | Internal Affairs Bureau<br>(Must respond to scene) | Threat, Resistance, or Injury Incident Worksheet & Investigating Supervisor Assessment Report |
| FIREARM DISCHARGE | • Discharge of a firearm | | • Person dies<br>• Seriously injured and likely to die immediately prior to police custody, during apprehension, or while in police custody | Force Investigation Division<br>(Must respond to scene) | Threat, Resistance, or Injury Incident Worksheet & Typed Letterhead (UF49) |

> *ALLEGATIONS[1]* of excessive force are typically made by civilian witnesses or subjects while *SUSPICION[2]* of excessive force typically arises from a supervisor's initial assessment or subsequent investigation into an incident.
> Discharge of a CEW/Taser requires the Immediate/Investigating Supervisor to be in the rank of Lieutenant or above (discharges by ESU may be handled by a Sergeant).[3]
> Ordering a subject to lay on the ground or guiding them in a controlled manner, drawing your firearm, using Velcro restraint straps, or using a polycarbonate shield to restrain someone is not considered a reportable use of force in the context of this procedure.
> If one incident contains multiple MOS using varying levels of force or non-MOS receive varying levels of injury, the supervisor responsible for the highest force/injury level will conduct the investigation.
> A TRI-Investigating Supervisor Assessment Report is completed by the CO/XO/Duty Captain or IAB to document the results of their investigation of a Level 2 or 3 incident.

FORCE POLICY REVISION                               REVISED MAY 27, 2016

272.    Prior to the use of the TRI report, IAB was called to the scene of in-custody injuries that resulted in a visit to the hospital.

273.    With the advent of the TRI report, if a supervisor claims or asserts that an injury occurred before the arrest, there is no investigation.

274.    With the advent of the TRI report, if a supervisor claims or asserts that an injury was not serious, there is no IAB investigation unless the officers admit they used deadly physical force.

275.     With the advent of the TRI report, if a supervisor claims or asserts that an injury was not serious, even where the injury required a visit to the hospital, but the arrestee was not admitted, there is no IAB investigation unless the officers admit they used deadly physical force (except for a firearm discharge which is only investigated by FID).

276.     Despite the NYPD defining Level 3 deadly force as "physical force that is readily capable of causing death or serious physical injury," no Defendant reported the use of force against Plaintiffs, even though Ms. Flores was choked and K.L. was thrown in a manner that could have caused death or serious physical injury.

277.     This new scheme results in fewer investigations into force being conducted by IAB and therefore, decisions about whether force was excessive are being handled at the precinct or borough level.

278.     The Mollen Commission explicitly warned about this type of approach which can lead to a lack of investigation at the precinct and borough level when incidents, like the one at hand, are not investigated or not sufficiently investigated or categorized.[33]

279.     This allows officers who are serial offenders of force incidents and other corruption to go undetected in a similar manner to the way that the similar setup including borough investigations and "tickler files," allowed officers like Bernard Cawley and Michael Dowd to engage in uncontrolled acts of corruption and abuse.

280.     As the Mollen Commission demonstrated, the officers with the most complaints including even complaints for discourtesy and suspected corruption and theft, were the most likely to be engaged in rampant abuse including excessive force, corruption, and criminal activity.

---

[33] *See* Mollen Comm'n Final Report, Section V "Fragmenting, Minimizing, and Concealing Police Corruption Cases" at 90-100.

### III.　　Defendants Rambert and Ferril's History of Misconduct:

281.　　Plaintiff does not presently have access to all relevant records for each Defendant, however, even the limited records available demonstrate that Defendants Rambert and Ferril were known to have a history of using excessive force and abusing their authority.

282.　　The City has failed to sufficiently investigate, properly retrain, supervise, and terminate each Defendants despite the notice provided for each Defendant.

#### *Detective Kenneth Rambert*

283.　　Defendant Rambert previously used excessive force on a young female who was present at an arrest of another individual.

284.　　On May 24, 2010, Shabana John was walking home from school between 2:30 and 3:30 p.m. in the afternoon.

285.　　Defendant Rambert and another officer were assigned to help prevent an altercation between two groups of students. John was not connected to either group.

286.　　At some point, John saw Defendant Rambert and the other officer hitting the boyfriend of one of John's friends.

287.　　John's friend yelled at the officers to stop hitting her boyfriend.

288.　　Defendant Rambert and the other officer pushed John's friend and placed her in a headlock.

289.　　John yelled at Defendant Rambert and the other officer to stop.

290.　　John grabbed the waist of her friend.

291.　　In response, Defendant Rambert and the other officer struck John in the back of the head with a baton several times.

292.　　As a result, John needed several staples on the back of her head.

293. Defendant Rambert and the other officer had John charged with assault in the second degree, assault in the third degree, menacing in the third degree, and disorderly conduct.

294. John subsequently filed a lawsuit against the City, Defendant Rambert, and another officer.

295. The City settled the lawsuit for $175,000.

296. The facts of the Shabana John incident closely mirror those here.

297. Defendant Rambert used force on a young woman.

298. Defendant Rambert used an extreme level of excessive force, to wit, hitting a young woman in the head with a baton.

299. Defendant Rambert responded in anger to a minor act by John of merely grabbing her friend's waist.

300. Defendant Rambert sought to bring false charges against John.

### *Defendant Damany Ferril*

301. Defendant Ferril has a history of using excessive force and abusing his authority.

302. Moreover, this history demonstrates that Defendant Ferril continues to commit misconduct despite prior disciplinary sanctions.

303. In 2021, Defendant Ferril was found to have wrongfully used physical force, failed to activate his bodyworn camera, failed to make required log entries, and failed to complete required NYPD reports. In 2022, the disciplinary case closed with the loss of 13 vacation days.

304. In 2021, the CCRB found that Defendant Ferril abused his authority by conducting an unlawful entry and search of a premises and failing to provide a right to know act card.

305. For these violations, Defendant Ferril received a Command A Discipline and was supposed to receive additional training.

306. In 2022, however, Defendant Ferril was again found to have committed an unlawful entry and search and violated patrol rules. It was recommended that Defendant Ferril be served with charges and specifications. It is unclear whether he was disciplined for this incident.

## ALLEGATIONS RELATED TO DEFENDANTS' CIVIL CONSPIRACY

307. Defendants engaged in a civil conspiracy, and/or common scheme which connects and/or links each Defendant with each of the causes of action alleged herein.

308. Defendants conspired and/or otherwise agreed among themselves and/or other agents, servants, and/or employees of the CITY, to cover up the unlawful acts committed against Plaintiff during and after his arrest.

309. Defendants carried out overt acts in furtherance of their conspiracy and/or agreement to cover up their misconduct, including the excessive force used against Plaintiffs, including, but not limited to: refusing to report the acts and omissions committed by Defendants to the NYPD's Internal Affairs Bureau (IAB), falsely reporting that Ms. Flores committed an assault, failing to document or notify any supervisor that Ms. Flores had been choked and subjected to excessive force, failing to complete required reports and entries, failing to classify the force used as Level 3 to avoid an Internal Affairs Bureau investigation, making false statements in official paperwork, making false statements to the District Attorney; and making false statements to CCRB and/or Internal Affairs.

310. Defendants carried out these acts intentionally, and in furtherance of their conspiracy.

311. Defendants who were not present during the initial incident, ratified the conduct thereafter by joining in the conspiracy to cover up the misconduct including the use of excessive

force against Plaintiffs.

312.    Upon information and belief, Defendants had carried out similar conspiracies on prior dates.

313.    Each conspirator engaged in these acts to protect themselves and their colleagues, but more so, because of deep-seated patterns and practices to do so in order to protect the reputation of the NYPD and its officers.

314.    Defendants' conspiracy resulted in damage and/or injury to Plaintiffs.

315.    Defendants' conspiracy links each Defendant to each of the state law causes of action described below.

## DAMAGES

316.    As a direct and proximate result of conduct of Defendants heretofore and hereafter set forth, Plaintiffs suffered, and continues to suffer, injuries and damages including, but not limited to:

   a.  violation of Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution

   b.  violation of Plaintiff's rights under New York State and City law;

   c.  physical injuries, pain, and suffering;

   d.  emotional distress, including fear, embarrassment, frustration, extreme inconvenience, and anxiety;

   e.  loss of liberty and unlawful confinement; and

   f.  any other damages that may become known during the pendency of litigation.

317.    Plaintiffs are entitled to an award of compensatory and punitive damages.

### FIRST CAUSE OF ACTION
**Excessive Force Pursuant to 42 U.S.C. § 1983**

*Against the Individual Defendants*

318.     Plaintiffs repeat and realleges the allegations contained in the foregoing paragraphs as if set forth fully herein.

319.     At all times relevant herein, the Individual Defendants were acting under color of state law.

320.     At all times relevant herein, the Individual Defendants' actions deprived Plaintiffs of rights, privileges, and immunities secured by the laws of the United States and the United States Constitution.

321.     At all times relevant herein, the Individual Defendants' intentionally, and without probable cause to do so, seized and/or confined Plaintiffs in an excessive manner, causing them physical injury.

322.     At all times relevant herein, the force used by the Individual Defendants was beyond that which was warranted by the objective circumstances at the time each incident occurred.

323.     At all times relevant herein, the force used by the Individual Defendants, including that which was used after Plaintiff's arrest, amounted to punishment without due process.

324.     Defendants' conduct deprived Plaintiffs of their rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from excessive force.

325.     Defendants' conduct deprived Plaintiffs of their rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from punishment without due process of law.

326.     At all times relevant herein, the Individual Defendants failed to intervene in each other's obviously illegal actions.

327.     Defendants' conduct deprived Plaintiffs of their rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution.

328.     Plaintiffs were injured as a direct and proximate result of Defendants' violation of their rights and are entitled to both compensatory and punitive damages, attorneys' fees, and costs.

## SECOND CAUSE OF ACTION
**Assault and Battery**
*Against all Defendants*

329.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if set forth fully herein.

330.     Defendants' intentional conduct placed Plaintiffs in imminent apprehension of harmful and/or offensive touching.

331.     Defendants engaged in and subjected Plaintiffs to immediate harmful and/or offensive touching and battered them.

332.     Defendants used excessive and otherwise unjustified force against the Plaintiffs.

333.     Defendant CITY is responsible for the tortious acts and omissions of its agents, servants, and employees, including, but not limited to the Individual Defendants and those officers who failed to intervene, pursuant to the doctrine of *respondeat superior*.

334.     As a direct and proximate result of Defendants' acts and omissions Plaintiffs have been damaged and are entitled compensatory and punitive damages.

## THIRD CAUSE OF ACTION
**False Arrest and Unlawful Imprisonment Pursuant to 42 U.S.C. § 1983**
*Against the Individual Defendants*

335.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if set forth fully herein.

336.     At all times relevant herein, the Individual Defendants were acting under the color of state law.

337. At all times relevant herein, the Individual Defendants' actions deprived Plaintiffs of rights, privileges, and immunities secured by the laws of the United States and the United States Constitution.

338. At all times relevant herein, the Individual Defendants' intentionally, and without probable cause to do so, seized and/or confined Plaintiffs and their property.

339. At all times relevant herein, Plaintiffs were aware of the Individual Defendants' seizure and/or confinement of her person and property and did not consent to it.

340. At all times relevant herein, the Individual Defendants failed to intervene to stop the false arrest of Plaintiffs and failed to release them from custody despite knowing his arrest was not based on probable cause.

341. Defendants' conduct deprived Ms. Plaintiffs of their right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution.

342. At all times relevant herein, the Individual Defendants deprived Plaintiffs of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

343. Plaintiffs were damaged as a direct and proximate result of Defendants' violation of their rights, and are entitled to both compensatory and punitive damages, attorneys' fees, and costs.

## FOURTH CAUSE OF ACTION
### False Arrest and Unlawful Imprisonment Pursuant State Law
### *Against all Defendants*

344. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if set forth fully herein.

345. Defendants acting individually, and in concert with one another, intended to confine and/or seize Plaintiffs.

346.     Defendants acting individually, and in concert with one another, confined and/or seized Plaintiffs.

347.     Plaintiffs were conscious of the confinement and/or seizure.

348.     Plaintiffs did not consent to Defendants' confinement and/or seizure.

349.     Defendants' confinement of Plaintiffs was not privileged.

350.     Defendants lacked probable cause to confine and/or seize Plaintiffs.

351.     Defendants lacked the reasonable suspicion to confine and/or seize Plaintiffs.

352.     At all relevant times mentioned herein, Defendants acted extrajudicially, and without a warrant.

353.     Defendants' seizure and/or confinement of Plaintiffs subjected Plaintiffs to a deprivation of liberty without probable cause.

354.     The agents, servants, and employees of the City, including the Individual Defendants, knew or should have known that Plaintiffs' confinement and/or seizure was unlawful and lacked probable cause, but failed to intervene to release him from the unlawful confinement despite their duties to do so.

355.     Defendant City is responsible for the tortious acts and omissions of its agents, servants, and employees, including, but not limited to the Individual Defendants and those officers who failed to intervene to release Plaintiffs, pursuant to the doctrine of *respondeat superior*.

356.     As a direct and proximate result of Defendants' acts and omissions, Plaintiffs are entitled to both compensatory and punitive damages.

<u>**FIFTH CAUSE OF ACTION**</u>
**Unreasonable Search and Seizure and Excessive Force**
**Pursuant to Local Law 48 of 2021**
***Against All Defendants***

357.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if set forth fully herein.

358.     Effective on May 24, 2021, Local Law 48 of 2021, amended the New York City Administrative Code (N.Y.C. Admin. Code §§ 8-801, *et seq*.) to create rights of security against unreasonable search and seizure.

359.     Effective on May 24, 2021, Local Law 48 of 2021, amended the N.Y.C. Admin. Code (§§ 8-801, *et seq*.) to create rights of security against excessive force.

360.     At all relevant times mentioned herein, Plaintiffs were persons aggrieved as defined in N.Y.C. Admin. Code. § 8-801.

361.     At all relevant times mentioned herein, Plaintiffs were subjected to and/or subjected to the deprivation of their rights granted and/or protected by N.Y.C. Admin. Code. § 8-802.

362.     At all relevant times mentioned herein, the Individual Defendants were covered individuals as defined in as defined in N.Y.C. Admin. Code. § 8-801.

363.     At all relevant times mentioned herein, Defendant City was the employer of the Individual Defendants and law enforcement officers who violated Plaintiffs' rights as alleged herein.

364.     At all relevant times mentioned herein, N.Y.C. Admin. Code. § 8-802 granted Plaintiffs the right of security against unreasonable search and seizure.

365.     At all relevant times mentioned herein, N.Y.C. Admin. Code. § 8-802 granted Plaintiffs the right of security against excessive force.

366.     At all relevant times mentioned herein, N.Y.C. Admin. Code. § 8-802 granted Plaintiffs the right of security against excessive force regardless of whether such force was used in connection with a search or seizure.

367. At all relevant times mentioned herein, the Individual Defendants and/or covered individuals employed by the City, violated Plaintiffs' right of security against unreasonable search and seizure guaranteed by N.Y.C. Admin. Code. § 8-802.

368. At all relevant times mentioned herein, the Individual Defendants and/or covered individuals employed by the City, violated Plaintiffs' right of security against excessive force guaranteed by N.Y.C. Admin. Code. § 8-802.

369. At all relevant times mentioned herein, the Individual Defendants and/or covered individuals employed by the City failed to intervene in the violation of Plaintiffs' rights secured by N.Y.C. Admin. Code. § 8-802.

370. At all relevant times mentioned herein, Defendant City is liable for the acts and omissions of its police officers, who are covered individuals including the Individual Defendants pursuant to N.Y.C. Admin. Code. § 8-803(b).

371. Plaintiffs have been damaged as a direct and proximate result of the violations of Plaintiffs' rights guaranteed by N.Y.C. Admin. Code. § 8-802.

372. Plaintiffs have suffered, and continues to suffer, physical injuries, emotional distress, economic losses, and was unlawfully confined in violation of his rights guaranteed by N.Y.C. Admin. Code. § 8-802.

373. N.Y.C. Admin. Code. § 8-802 prohibits Defendants from raising as a defense to this cause of action, the defenses of qualified immunity or "any other substantially similar immunity."

374. The CITY has, by legislative pronouncement, and pursuant to the Mayor's refusal to veto N.Y.C. Admin. Code. § 8-801, et seq., knowingly waived its sovereign immunity with respect to the portions of the law which permit punitive damages and prohibit the use of immunity defenses as stated therein.

375.    Pursuant to N.Y.C. Admin. Code. § 8-805, Plaintiffs are entitled to compensatory damages, punitive damages, attorneys' fees and costs, injunctive relief, and other equitable relief as the Court deems appropriate.

**SIXTH CAUSE OF ACTION**
**Negligence, Negligent Infliction of Emotional Distress, and**
**Negligent Hiring, Retention, Training, and Supervision**
***Against All Defendants***

376.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if set forth fully herein.

377.    Defendant City owed a duty of care to Plaintiffs to adequately hire, train, retain and supervise its employee Defendants.

378.    Defendant City breached those duties of care.

379.    Defendant City placed Defendants in a position where they could inflict foreseeable harm.

380.    Defendant City knew or reasonably should have known of the propensities of its employees, including the Individual Defendants, to commit civil rights violations and other unethical, corrupt, and violent acts.

381.    Upon information and belief, said personnel files, records and disciplinary histories will demonstrate that the City was fully aware of the Individual Defendants' past constitutional violations, unsuitability for police work, misconduct, violence, criminality, and/or corrupt behavior, and as such, of the unacceptably high probability for the recurrence of similar transgressions, the unreasonably dangerous situations that were likely to result from their hiring or retention, as well as their unsuitability for employment as law enforcement officers, or for public employment in general.

382.    Upon information and belief, the City failed to engage in any preventive or corrective action intended to diminish the likelihood of recurrence for such violations, which is tantamount to

the City's tacit approval of such misconduct or the City's deliberate indifference towards the civil rights of those who may interact with its employees, including the Individual Defendants and their fellow officers.

383. Upon information and belief, Defendant City failed, or outright refused, to correct the prior unconstitutional, violent, corrupt, or dishonest behavior of the officers at issue, including the Individual Defendants, and thus, failed to prevent the exercise of such behavior against Plaintiffs.

384. Defendant City failed to take reasonable measures in hiring, training, retaining and supervising its employees, including the Individual Defendants that would have prevented the aforesaid injuries to Plaintiffs.

385. Defendants negligently breached their duties of care to Plaintiffs and in doing so, inflicted emotional harm upon Plaintiffs.

386. Plaintiffs were physically injured and suffered understandable mental trauma as a result of being brutalized and violated by the Individual Defendants and the City.

387. Defendants use force as part of their employment with the City.

388. Defendants have a duty to use force with reasonable care.

389. Defendants failed to use force with reasonable care.

390. Defendants used force for a common objective.

391. Defendant City negligently entrusted its authority to Defendants.

392. Defendant City knew or should have known Defendants would not conduct themselves with reasonable care.

393. Defendants' misused and abused their authority in dealing with Plaintiffs as a result.

394. Defendant City is responsible for the tortious acts and omissions of its agents, servants, and employees, including, but not limited to the Individual Defendants and those officers

who failed to intervene or who otherwise caused Plaintiffs harm pursuant to the doctrine of *respondeat superior*.

395.     At all times relevant herein, the Individual Defendants failed to intervene in the obviously negligent, careless, reckless, and illegal actions of their fellow officers including those of the other Individual Defendants.

396.     As a direct and proximate result of Defendants' acts and omissions, Plaintiffs are entitled to both compensatory and punitive damages.

### SEVENTH CAUSE OF ACTION
**Pursuant to 42 U.S.C. § 1984, *Monell* claim**
***against Defendant THE CITY OF NEW YORK***

397.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if set forth fully herein.

398.     Defendant City maintained policies, customs, practices, and procedures that caused Plaintiffs to be deprived of their civil rights, and tacitly approved of such violative conduct or was deliberately indifferent toward the potential exposure of individuals, such as Plaintiffs, to such violative conduct.

399.     Defendant City's employee police officers have engaged in an illegal pattern and practice of misconduct, so consistent and widespread that it constitutes a custom or usage, of which a supervisor or policymaker must have been aware of.

400.     Defendant City, its policymakers and supervisors engaged in an illegal pattern and practice of misconduct, so consistent and widespread that it constitutes a custom or usage.

401.     Defendant City, its policymakers and supervisors failed to provide adequate training or supervision to their subordinates, to such an extent that is tantamount to the City's deliberate indifference toward the rights of those who may come into contact with Defendant City's employees.

402. Defendant City's employees engaged in such egregious and flagrant violations of Plaintiffs' Constitutional rights that the need for enhanced training or supervision is obvious and equates to a display of deliberate indifference by Defendant City and its policymakers toward the rights of individuals, who may encounter Defendant City's employees.

403. Defendant City's repeated refusal or failure to install or apply corrective or preventive measures constitutes the tacit approval of such violative behavior or a deliberate indifference to the rights of those who may be affected by such behavior.

404. Defendant City, its policymakers and supervisors encouraged and approved of wide-spread and pervasive violative behavior and/or deliberative indifference to the rights of those who may be affected by such behavior.

405. Defendant City's conduct caused Plaintiffs to be deprived of his civil rights, as guaranteed by the Constitution of the United States, via the First, Fourth, Fifth & Fourteenth Amendments thereto.

406. Plaintiffs were damaged as a direct and proximate result of Defendants' violation of his rights, and in an amount that exceeds the jurisdictional limits of all lower courts.

407. The City of New York is liable to Plaintiffs given its recalcitrant patterns and practices as well as persistent failure to train its agents, servants, and employees with respect to: 1) *Debour* and/or analyzing the conduct required to stop, question, frisk, pursue, and detain and/or arrest citizens in street encounters; 2) appropriate conduct during encounters with citizens; 3) the use of force, deadly force, and the requirement to use only reasonable force under the circumstances;  and 4) the duty to intervene to prevent other law enforcement officers from violating the civil rights of arrestees and/or citizens.

408. For all of the millions of dollars that the City spends on tactical and weapons trainings,

and policies related thereto, it spends very little time and money ensuring that its employees are properly trained in realistic scenarios geared toward conducting the basic street-level encounters that make up the majority of citizen interaction and majority of constitutional violations by the NYPD, as here.

409. While the individual Defendants bear responsibility for their own acts and omissions, the City is also responsible for its egregious and longstanding failures that led to the violation of Plaintiffs' constitutional rights and irreparably harmed Plaintiffs.

410. The City has failed to train its officers on their duty to intervene in unconstitutional conduct by other officers, including the use of excessive force and the denial of medical treatment to those like Plaintiffs, who are injured by excessive force.

411. The City has failed to train its supervisors and investigators to ensure that officers who commit misconduct are supervised, retrained, demoted and/or terminated.

412. Instead, the City, if it punishes officers at all, merely demands that they forfeit some of their numerous vacation days even where they have engaged in egregious uses of excessive force and misconduct.

413. The City rarely, if ever, punishes or even investigates the failure of officers to intervene in excessive force or other misconduct that they witness, despite having a stated policy that holds that to fail to intervene and/or fail to report misconduct, is itself misconduct.

414. Moreover, the City, acting through its officials has sought to diminish and degrade the infrastructure used to punish misconduct and other violations by its police officers.

415. The City knows to a moral certainty that the ongoing failure to train its officers will lead to officers making unconstitutional choices that sometimes have horrific and deadly consequences.

416.     Plaintiffs were damaged as a direct and proximate cause by City's ongoing failure to train its officers, and failure to promulgate policies that encourage the lawful policing of New York City and discourage unlawful, dishonest, and criminal behavior among NYPD officers as articulated throughout the complaint.

417.     Plaintiffs were damaged as a direct and proximate result of Defendant City's violation of their rights, and are entitled to both compensatory and punitive damages, attorneys' fees, and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment in their favor, and against Defendants, as follows:

a.  Award compensatory damages in an amount to be determined by a jury for all physical, psychological, mental, and emotional injuries, sustained by Plaintiffs as a result of Defendants' conduct as alleged herein;

b.  Award punitive or exemplary damages in an amount to be determined at trial;

c.  Award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

d.  Award pre- and post-judgment interest at the maximum legal rate;

e.  Declare that Defendants' policies, procedures, practices, and customs, as well as Defendants' failure to train, supervise, and discipline, violate the rights of Plaintiffs, and decree such prospective relief as the Court deems appropriate to remedy said violations; and

f.  Grant all such other relief as it deems just and proper.

DATED: New York, New York
       October 11, 2024

       Respectfully,

       LIAKAS LAW, P.C.
       *Attorneys for Plaintiffs*
       40 Wall Street, 50th Floor
       New York, New York 10005
       Tel: (212) 937-7765

       /s/

       _____
       JOSHUA J. LAX, ESQ.

       /s/

       _____
       CASSANDRA ROHME, ESQ.